Good morning, Ms. Goldman. Good morning. May it please the Court, I'm Lauren Goldman arguing on behalf of both appellants. I'm here with Jason Burnett for Appellant RJR. If upheld, the judgment in this case will be the largest ever entered in an Engel progeny case in this state. The judgment should be reversed for two reasons. First, the damages awards are grossly excessive. The $16 million award for pain and suffering here exceeds the largest similar case by $6 million and is well outside the realm of approved incomparable cases. The punitive awards totaling $25 million are far more than necessary to serve Florida's legitimate interests and punishment and deterrence in this case given the number of pending similar cases and the extent to which the harm suffered by the plaintiff's record would suggest was horrible. Absolutely, Your Honor, and defendants do not contest that. However, there have been a number of other Engel progeny cases in this state involving similar injuries, similarly serious injuries by other plaintiffs, and this case is well outside the norms that are established by those cases. The district court had a look at whether the award was supported by the evidence and bore a reasonable relationship to the amount of damages proved and the injury suffered. What that means is that the court has to look at whether the award was within a reasonable range in which the jury could properly operate. This court has recognized, and the Florida Supreme Court recognized most recently in Odom, that to undertake that analysis, it's important to look at similar cases. The Supreme Court of Florida has also said comparisons are sometimes fraught with danger because, of course, each case is different and must of necessity be measured in the light of the circumstances peculiar to it, right? That while other verdicts in similar cases may be instructive, those cases are not dispositive in determining whether a specific verdict is excessive. Measuring non-economic damages is inherently difficult. The jury, guided by its judgment and everyday life experiences, is in the best position to make a fair assessment of these damages, right? Well, that's absolutely true, but in the same decision, the court did say, as your Honor pointed out, that these other cases are instructive and that it's important to look at whether the case is within the realm. We're not saying that a case that's a tiny bit above . . . But they're particularly instructive in this situation, your Honor, because there is a robust body of similar cases. We pointed to, in our briefs, to 16 cases involving injuries, lung injuries, in the angel progeny world. Every award higher than this one was reversed. The next highest set of awards, there were three of them, and they were each for $10 million, and those cases had very, very similar facts to this case. In Boatwright, the plaintiff had COPD for 25 years. He underwent two double lung transplants, which had numerous complications, including a ruptured colon that resulted in a colostomy bag. In Smith, the plaintiff had a lung removed, he had radiation therapy, he had chronic shortness of breath, and lived for a very long time. So, unfortunately, these cases do involve terrible injuries, but so did these other cases in which $10 million was viewed as reasonable compensation. And, in fact, the award here exceeded the amount that the plaintiff requested by $6 million, which is also, again, not dispositive. We're not saying that any of these things are dispositive, but certainly an indicator that the award is excessive and that the jury was considering improper factors. The plaintiff said, I would suggest that $10 million is the right amount. I think that's the fair and just amount. We submit that $10 million is the appropriate number. And the jury awarded $6 million more than that. Now, there's a presumption that plaintiffs don't ask for less than they think that the evidence permits. They certainly ask, generally, for more than they think the evidence permits. But the jury here awarded $6 million more than the plaintiff thought was fair. I have a question on punitive damages before your time expires. Your argument that repeated awards of punitive damages are more than adequate to both punish and deter, which is a reasonable argument, but has any court accepted that argument that you can point to here? Not, no, not the way that we're framing it in this argument. It's a corollary of what the US Supreme Court held in Williams, Your Honor. I know the court is familiar with the Williams case. The Supreme Court held that the punishment in any given individual case has to reflect the harm to that plaintiff. The corollary to that is that if you have a situation like this one, where you have thousands of pending similar cases, you can't impose more in one case than that person's proportional share of what would be a reasonable aggregate punishment. That's not the law right now. Maybe the Supreme Court may find that to be the law to be applicable here. Hasn't that been rejected by the Florida Supreme Court and maybe by courts in the circuit? I'm not aware of courts in the circuit. You're right that the court rejected it in Schaff, but that's a state court speaking on a federal issue, so it's not entitled to any deference in this context. This is a federal constitutional issue. In addition, in Schaff, the court pointed out that RJR in that case had not put in any evidence of the number of cases in which it was a defendant. How would that work in practice? In other words, let's apply that principle to this case. How would the jury determine the punitive award on a case-by-case basis? It's not a jury issue, Your Honor. It's a question for the reviewing court. In Cooper v. Leatherman, the court said that the constitutional amount of limit on punishment is not really a fact to be tried by the jury. It's something for the court to analyze on review, and that's why review of punitive awards is de novo when the court is just seeking to apply the constitutional limits. What would we be looking at? You would be looking at the fact that the defendants are subject to thousands of these pending cases. We put in evidence before the district court that Philip Morris is a defendant in 2,300 pending cases at the time of trial. You would also look at the fact that the conduct at issue here is fully regulated by the FDA and by the defendants' agreements with the state and cannot recur, that it was undertaken by people who are long gone from the companies and pursuant to policies that no longer exist. So you would look at all of those factors. The important thing in any punitive damages case, as Your Honor is to assess whether the ward is necessary to serve the state's interest in punishment and deterrence. And so we would just submit that $25 million here against both defendants is not necessary to serve those legitimate state interests. Just going back very briefly to the compensatory award, I just want to point out the magnitude of that $6 million gap between this case and the next largest case. So the average award in a case of this kind, an engel progeny case involving lung disease, is about $4 million. So the gap between this case and the next three highest cases is greater than the average amount awarded, total amount awarded to a plaintiff in one of these cases. Just very briefly on fraud, Your Honor. Defendants were entitled to a directed verdict on plaintiff's fraud claims because he did not prove reliance. He did not show that he had a misapprehension about the risks of smoking or the addictive powers of nicotine, much less that any such misapprehension was derived from anything that defendants said or did. Plaintiff had to prove individualized reliance under the Florida Supreme Court's decisions in Engel and in Douglas, and plaintiff didn't do that. He testified that he knew the risks of smoking and continued smoking because he liked to, and he didn't testify that there was anything that he didn't know that would have been remedied by the defendants giving him more information that they said anything misleading to him that he believed and acted upon to his detriment. If the court has no further questions, I'd like to save the rest of my time for rebuttal, please. Absolutely. So we'll give you six on rebuttal. Professor Azakaroff. Good morning, Your Honor. Samuel Azakaroff from Mr. Kerrigan. The heart of the claim is that the award was too high, and the question is how do we know whether something was too high, and what defendants have done is they have sliced and diced. They said this is an individual award for lung injury, and so they categorize, well, Lukasz was higher, but that was not an Engel case, and another case that was a cancer case. This is a decedent, and this particular individual is a living claimant. There are ways in which you can test whether something is an outlier. This is basic statistics, and the way you do it is not you say this one is higher than all the others. We've had 300-plus Engel progeny trials, and I can guarantee you that one of them will be the highest of necessity, and that cannot be a constitutional marker that unconstitutionality kicks in for whichever one is highest, because then we're going to have another one that's no, and this is something that only the tobacco defendants can do, because they are the only ones who have all the information. You could take all 300 verdicts, and you could say what is the median, what is the mean, and most importantly, the way the Supreme Court endorsed in the Hazelwood case for employment discrimination cases, you could say is this beyond two standard deviations of what the norm is. If you were to do that, what you would have to take into account is not just the top end, it's the zero awards, and that's why they didn't do this kind of analysis, because in the Ryder case, which was argued to this court in 2015, Judge Pryor, I believe you were on that panel, that was a case where a jury found liability and awarded zero damages. In that case, there was a challenge based upon incommensurability among various jury findings, and this court ultimately held it was waived. In the course of defending the zero award in that case, tobacco made the point that as of 2015, there had been eight cases in which liability had been found and zero had been awarded. The first case that was argued to this court on a judgment was a case involving Walker and Duke. Again, Judge Pryor, you wrote that opinion. I argued the case, and I said, how can it be that a jury was unreasonable toward the defendants if they awarded $34,000 in two death cases, and the court cautioned me and said, look, that's just the way it goes in tobacco cases. There's a lot of variability. I agree with that. In fact, not only do I agree with that, tobacco agrees with that. In their brief filed in the Ryder case in 2015, authored, signed by the same lawyers, by the same firm, by the same lawyers as here, they said the following, non-economic damages for pain and suffering and loss of support are widely recognized as being largely speculative. They wrote that citing Florida case law to that effect. Then they went on to say this court, meaning the 11th Circuit, is therefore wary of disturbing a jury's decision regarding non-economic damages, especially when there's evidence in the court to support the jury's conclusion. They're not arguing here that there's no evidence that Mr. Kerrigan was harmed. Clearly not. They're just arguing the evidence should have been measured in a different way. Absent from their brief entirely is Judge Erickson, because the law in Florida and the law in this circuit is that special deference is owed, not just when the jury has made a determination, but when there has been active review by the district court judge on a motion for a remitter. Here there was, and there were specific findings made by Judge Erickson, which are exactly the findings that this court has instructed district courts are supposed to make in these kinds of cases. The argument that this is just too much is one that belies any kind of proof in this case. Yes, this one is higher than many. It is higher than most. There are a couple that one could argue are comparable, but then if you really wanted to say it's an outlier, you have to examine the zero awards. That's something that they have refused to do, even though that was available to them because they have the full range of trial verdicts available to them. They know them. They're the defendants. If there's no question on that, I'll move to the punitive damages. On the punitive damages issue, the ratio here is 1.6 to 1. That's what the Supreme Court has focused on. 1.6 to 1 is the same as the ratio in Searcy, which this court just upheld a short while ago. It's less . . . . . . 1.6 to the collective amount of punitive damages that have been awarded in all cases. When does it trigger, if at all, a due process violation? Judge Rubino, I think that that is the hardest question in the law of punitive damages. It's one that's been in the background for many, many years and the courts have not known what to do with it. The answer could be that there is a constitutional cap on punishment. There was a case that went up to the Second Circuit almost twenty years ago called In Re Simon 2, in which there was a class certified by the district court for a single punitive damages award for tobacco for all cases. That would have wiped it out. The theory of there has to be a limit on punishment, so let's just do it once. Tobacco defeated that certification. Sometimes you lose for winning. There was another case that tried to do punitive damages all at once and get rid of it. That was Engle. That was Engle. It would have taken care of this problem entirely. Tobacco didn't seek to remit that, didn't seek to reduce it, didn't seek to try to negotiate it down. They overturned it on state, constitutional and other grounds. They have to live with this. They can't have it both ways. They can't say you can't do it once and for all and you must do it in every single case. In this case, because of the Engle ruling, what the instruction to the jury was and what the closing argument by plaintiff's counsel was, was that this jury could only take into account in punitive damages the harm suffered by a one-and-done, once-and-for-all type analysis. As a sophisticated constitutional matter, your honor, I tend to think that that there is something out there that could be done to collectivize, to aggregate the punitive damages. We haven't figured it out as a judiciary, but what we know right now in the Engle progeny is that they wiped out the claim for collective assessment of punitive damages, demanding that it be assessed on an individual by individual cases. They live with what they won. On the question of reliance, there are two elements that have now been established on the reliance part of this, especially in light of this court's recent decision. We call it Berger. Sometimes it's called . . . Cote is now the current name. I'll use Cote as the name under which it's reported. One is if there is reliance on misrepresentations. The second is if there is reliance that's established by conduct that would have been different responding to an omission. The Florida Supreme Court has upheld that distinction for decades. It goes back to the restatement first of torts, that you cannot possibly rely overtly when information is withheld from you. In this case, we meet both standards. The reply brief filed by the appellants says there's no evidence of anything at all. That's quite wrong. What you have in this case is Judge Erickson making specific findings that there was affirmative reliance. Judge Erickson says there was specific testimony by Caravan about the tobacco company defendants advertising that he saw and which influenced his decision. He went on to find decades-long pervasive advertising campaign and creation of false controversy and that Mr. Caravan smoked filtered cigarettes in response to the ad campaign about this. The record fully supports that. There was testimony from an expert witness, Dr. Proctor, who figured out the years in which tobacco companies started to promote filtered cigarettes and then in which they promoted light cigarettes. What he testified was that filtered cigarettes were the big push around the time of the 1966 Surgeon General's warnings. Mr. Caravan testified that he started smoking filtered cigarettes right in that period. You have actions that conform to what he had seen and as the district court said, he relied upon that. He actually saw these ads. The second step was that he moved to light cigarettes in the 1970s and again the testimony from Dr. Proctor was that that's exactly when tobacco started marketing these and Caravan testified once again that he saw those ads. He was over to Marlborough Lights as soon as they came out basically in 1971. You have direct testimony and you have the district court making a separate investigation assessment of the facts to say that this is correct. On the second point, on the omission point, there is now law in the Florida courts in the Dinan case and then picked up it by this court in the Cote case that says in the context of a pervasive advertising campaign, what happens there? What happens if you just don't know? If they say there's no health risk or something of that sort and what this court says is that there's a three-part test for this. That Florida permits an Engle progeny jury to infer reliance based on evidence that the plaintiff was exposed to the disinformation campaign, so exposure and harbored a misapprehension about the health effects and their addictive nature of smoking. Those are the two threshold elements and then the key element is whether the plaintiff would have behaved the same way had she in that case known the true facts. Judge Caravan makes a finding on each and every one of these. I want to focus on the last one. I'm sorry, Judge Erickson, yes, makes a finding on each and every one. I want to focus on the last one because here the testimony is as clear as could be and this is before Dinan. This is testimony back in 2014, so it wasn't prepared in anticipation of this particular legal standard and at document 83, page 97, if you had known how bad the cigarettes would be for you and how hard it would be to quit, would you have started smoking? Started? No, I never would have in the in the court case. Now there's an intimation in the brief. They don't develop this argument. Or would have quit smoking earlier. Or would have quit smoking and the testimony is that the records replete with efforts. Every year he made an effort at New Year's and then at other times to stop smoking and he was unable to. He only did so in 2006 when his doctor said he would die within six months. Right, the testimony is actually more graphic, Your Honor. The testimony is that he had double pneumonia and so he could barely breathe and so he was trying to smoke at the beginning of this and then found it was impossible and that's what finally led him to quit smoking. That was the moment where he quit smoking. There is an intimation that the Coate case is so broad that it has to be overruled and that there's subsequent cases. Reliance only? Unreliance, unreliance. And basically the argument is well if the question is the pervasiveness of the tobacco advertising campaign then everybody relied because we've all seen these ads and it's it's an interesting question and we among ourselves refer to this as the caveman question. What if somebody lived in a cave and saw no ads and would they be able to make out this kind of a reliance claim? Actually we have case guidance on this now because in the Whitmire case the Florida court made specific findings that in fact Mr. Whitmire was in our sense the proverbial caveman, that he had never seen these advertisements and and it says there's no evidence of any exposure to disinformation ads, no testimony connected to the scenes smoking to the false testimony, no connection to any conception about health effects and so I read Whitmire and they've they asked for rehearing in in Coate on the basis of Whitmire, they've asked for rehearing in several Florida State cases on on base of Whitmire, nobody's given it. But Whitmire is, they persuaded a court that Whitmire was actually someone who was completely immune to the effects of their multi-year multi-billion dollar advertising campaigns. I find that account of Mr. Whitmire not credible but they persuaded a court so here again they lose by winning because now they have established a legal standard that says if you can prove somebody was the caveman then you can't have this kind of reliance. Nothing in the record looks like that. Thank you. We'll hear from Ms. Goldman. Thank you, your honor. Taking the opposite order so that I start where Mr. Professor Zakharoff finished. Reliance is an individualized issue and this plaintiff took the stand. It's true that there are cases about inferences but they make a couple of things clear. One is that an inference evaporates in the face of evidence to the contrary. Another and Whitmire shows this but Coate also recognized it, is that you can't, all the inference gets you is that the plaintiff didn't live in a cave. You can infer that he saw ads and here in fact Mr. Keravan testified that he saw ads. What he didn't testify was that those ads gave him a misimpression about the health risks of smoking or the addictive power of nicotine. I thought he said that he if he had known how bad or addictive cigarette smoking was that he would have never started or would have earlier. He did give that testimony toward the end of the trial. Isn't that enough? No it's not enough because he even even if that were credible in light of all of his testimony that he knew the risks starting when he was a little boy. Credibility determined. I understand your honor. Let's assume that it's completely true. He needs to tie that misimpression causally to something that the defendants said or did. It's not enough as Degnan which plaintiff relies upon recognize. It's not enough to say well the tobacco company should have told me. You have to point to a misimpression that you had a specific misimpression that you had about the risks of smoking and show how that is tied to something that the defendants said or did. You can't just infer causation because then reliance would not be an individualized issue as the Supreme Court of Florida said that it was in both Douglas and in Engle. And that's what Whitmer testified that he switched from Marlboro Reds to Marlboro Lights because he thought he wouldn't get so much tar and nicotine with the lights and he thought they would help him quit smoking. That's right your honor but what happened but looked at in its entirety that testimony shows exactly why there was no reliance. He did get less tar and nicotine. He started smoking more cigarettes per day and he quickly switched back to Marlboros, full flavored Marlboros because he was getting less and he recognized that there could be no detrimental reliance on that because he didn't stick with lights. He switched back to Reds so he said they made him crave the cigarette more and he started smoking two packs a day to get that kick. Well he started smoking more of the Marlboro Lights and then he switched back to Reds. So something that you smoked for a short period of time even if it was in reliance on ads can't cause your injuries in that way. Plaintiff never has argued that it did. And he never pointed to anything other than the lights descriptors that made him think that lights would be safer or healthier and as the first District Court of Appeals said in Whitmire, it's not enough to just say you thought based on the descriptors that the product was healthier. You have to show how you relied. So the court said lights, filters, you can't just say I thought they were healthier because there were lights or filters. That's from Whitmire. So Cote in fact shows how this case is very different from the testimonial issue in the Cote case. So in Cote the plaintiff testified that having seen ads for for with the Marlboro man she thought that smoking wasn't that bad and those ads caused her to think that. Whitmire was a wrongful death case? It was your honor I think. There was no testimony from the smoker about being exposed to or influenced by the disinformation campaign? I believe that is correct your honor. But that is exactly why it's important to scrutinize the reliance evidence here. You have a plaintiff who took the stand. Whether you can or cannot make certain inferences in a case where the plaintiff is not available to testify, Mr. Caravan here took the stand and he still didn't identify anything that the defendants said or did that gave him a misimpression about the risks. It seems to me to be pretty easy, much easier to conclude that there was an opposed to this where we have a living smoker who testified. I think it's actually the opposite your honor because where you have a living smoker who testifies and his lawyers certainly know what it is he needs to testify in order to survive a directed verdict, you have to really look at his testimony and not draw inferences based on the scope of a campaign. This man testified that he didn't look at cigarette ads, that he wasn't interested in cigarette ads because he knew what brands he liked. He testified that his earliest memory was of his father scolding his mother for smoking and he never testified that he didn't understand that cigarettes were addictive. You have a living smoker who is again going to testify everything that he can possibly testify to demonstrate reliance and we submit it doesn't get there. Code is very different because she said that as a result of the ad she didn't believe the search and general warnings. That's the type of testimony that this court has held establishes reliance. There really is nothing like that here. Saying had I known the truth, had I known just how bad or addictive they were, I wouldn't have started or would have quit earlier. It's pretty close to code, isn't it? No because in code she pointed to specific ads she saw. She said what impression she got from those ads and she said so then I thought the search in general was speculating. That's very very different. That's very specific. You're pointing to specific ads. You're saying I believe those ads. They said X. X made me question the search in general's warnings. Mr. Caravan testified that he saw the search in general warnings and he understood them and that he believed that they were telling him that he shouldn't smoke because smoking was bad for him. On the verdicts we didn't cherry-pick. We gave the court the entire range of comparable cases. Plano accuses us of cherry-picking but they have never pointed to any award larger than this one even in the wrongful death. You have a point that at some point some award has to be the largest. Correct but but your honor there can't be a one-way ratchet. It can't be that every award. But his response to the one-way ratchet argument is you're employing a one-way ratchet by not considering the zero. We did your honor when we gave the court that four million dollar average of the 16 living the 16 wrong sorry personal injury cases involving lung disease. You're not making the two standard deviation argument are you? I don't think that the that there is any basis in Florida law for saying that an two standard deviations away from the mean to be excessive. The Florida law cases are quite to the contrary. Oh I have 30 seconds. No I'm over. You can finish. The Florida cases say that you are to scrutinize the comparable cases to see whether the jury is operating in a reasonable range and that's what we've done. There is nothing about standard deviations in the remediator statute or the cases. We gave the court the universe of cases. There is nothing higher except Lukacs where it was waived and that's the universe. Plano's have never come up with anything different. As always both sides well argued. Thank you your honor. Thank you very much. Fort Saccas versus Attorney General. you